UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>PALANI BULL BEAR,<br><br>Defendant. | 5:18-CR-50076-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant's Motion to Suppress (Doc. 54). A hearing was held on Wednesday, March 6, 2019. Defendant was personally present and represented by his attorney of record, Terry Pechota. The Government was represented by the Assistant United States Attorney Megan Poppen. Two witnesses testified at the hearing. Nine exhibits were received into evidence. Supplemental briefing concluded on March 28, 2019. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

### **RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress be denied in full.

**JURISDICTION**

Defendant is charged in a Superseding Indictment with Second Degree Murder, in violation of 18 U.S.C. §§ 1111(a) and 1153; Discharge of a Firearm During the Commission of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); Assault with Intent to Commit Murder, in violation of 18 U.S.C. §§ 113(a)(1), 1153, and 2; and Assault with a Dangerous Weapon, in violation of 18 U.S.C. §§ 113(a)(3) and 1153.  The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated April 1, 2018.

**FACTUAL BACKGROUND**

On June 27, 2018, at approximately 11:00 p.m. in Kyle, South Dakota, Defendant Palani Bull Bear allegedly shot and killed Brycee Red Owl, and allegedly shot at, but did not injure, Tolin Gregg.  (Doc. 67 at p. 7–9, 36).  FBI Special Agent Kevin Seymore and BIA Special Agent Ted Thayer investigated the shooting and testified at the suppression hearing.  The court finds their testimony credible.

Between approximately 11:30 p.m. and 12:00 a.m. on the night of June 27, 2018, FBI Special Agent Chris Corwin and SA Seymore were informed of the shooting.  (Id. at p. 5).  The agents arrived at the scene of the shooting in Kyle shortly before 3:00 a.m. the morning of June 28.  (Id.).  Upon arrival, the agents met up with several tribal police officers as well as BIA Special Agents Molanna Clifford and Ted Thayer.  (Id. at p. 5–6).  The deceased victim had already been located.  (Id. at p. 7).

2

After arriving at the scene, SA Seymore spoke with Tolin Gregg, who had witnessed the shooting. (Id. at p. 7–8). Mr. Gregg stated that he believed Palani Bull Bear was the suspect, and described the events of the shooting. (Id. at p. 8–9). Mr. Gregg indicated that after the shooting, Defendant headed west towards the Lil' Angels convenience store, on the outskirts of the Kyle housing area. (Id. at p. 9–10). Tribal police informed the agents that Defendant's family was out at the Kyle sundance grounds, located approximately eight miles east of Kyle. (Id. at p. 10). Law enforcement concluded Defendant likely would head to the sundance grounds to meet up with his family. (Id.). At approximately 6:00 a.m. on June 28, law enforcement was notified that Defendant arrived at the sundance grounds. (Id. at p. 11). Tribal law enforcement arrested Defendant at the sundance grounds. (Id.). Before handcuffing Defendant, tribal law enforcement read Defendant "tribal Miranda rights" and then transported Defendant directly to the Medicine Root Detention Center in Kyle. (Id. at p. 11–12).

At approximately 7:30 a.m. on June 28, SA Seymore and SA Clifford interviewed Defendant at the Medicine Root Detention Center. (Id. at p. 12). The interview room was approximately ten feet by fifteen feet, with one door and a window looking into an adjacent room. (Id. at p. 13, 15). A tribal officer was present in the adjacent room, but did not participate in the interview in any way. (Id. at p. 15). SA Seymore wore khakis and a white polo shirt, and did not display his gun. (Id. at p. 12, 20).

Defendant was not handcuffed or otherwise restrained during the interview. (Id. at p. 16). Defendant moved slowly, as if he felt sore, but did not appear unsteady or intoxicated. (Id. at p. 17). SA Seymore testified that Defendant appeared a little tired but alert and aware of what was happening. (Id.). Defendant appeared calm and did not seem nervous, afraid, anxious, or upset. (Id. at p. 17–18).

After SA Seymore and SA Clifford displayed their law enforcement credentials and identified themselves, they read Defendant his Miranda rights from the standard BIA Advice of Rights form. (Id. at p. 19; Ex. 2). SA Clifford read each right individually; after going through each one, she asked Defendant if he understood. (Ex. 1 at 1:57–3:15). Defendant responded that he understood each individual right, and checked and initialed each box on the BIA form also indicating he understood each right. (Id.). SA Clifford then asked Defendant if he was willing to waive his rights and speak with the agents. (Id.; Ex. 2). Defendant responded yes, checked and initialed the box indicating he was willing to waive his rights, and signed and dated the BIA form. (Ex. 1 at 3:09; Ex. 2).

After Defendant agreed to speak with the agents, SA Clifford asked Defendant what happened the night before. (Ex. 1 at 4:10). Defendant responded without hesitation and made incriminating statements. Defendant spoke coherently and calmly, gave responsive answers, provided a detailed description of the shooting, and drew a map for the agents depicting where he might have dropped his gun. Defendant told the agents how he arrived at the

4

sundance grounds, and described the firearm and explained how he acquired it. (Id.). The agents made no threats or promises, spoke slowly, and did not raise their voices. The tone of the interview was conversational. At no time did Defendant ask to stop the interview, or say he was too tired or too sore to continue. (Id.). The interview terminated at 8:08 a.m. (Ex. 1 at 29:35).

When the interview ended, SA Thayer, SA Seymore, SA Corwin, SA Clifford, and tribal officers Wilson Quintana and Pete Plenty Bulls searched for Defendant's gun in the location Defendant had described. (Doc. 67 at p. 71). The officers were unable to find the gun, and terminated the search at approximately 9:00 or 9:30 a.m. (Id. at p. 72). Shortly afterwards, SA Clifford returned to the jail, retrieved Defendant, and drove him to the search area to help find the gun. (Id.). Defendant remained in the vehicle with SA Clifford and told her where he thought the gun could be. (Id. at p. 73). Law enforcement never found the gun. (Id. at p. 74). On or about that same day, the Oglala Sioux Tribe charged Defendant with homicide and a weapons offense. (Doc. 67 at p. 22).

On the following day, June 29, 2018, SA Thayer and BIA SA Darrell Robinson spoke with Defendant at the Medicine Root Detention Facility. (Id. at p. 75; Ex. 9). SA Thayer attempted to record the interview but discovered later that his recorder had malfunctioned. (Id. at p. 76). The agents advised Defendant of his Miranda rights from the standard BIA Advice of Rights form. (Id. at p. 77; Ex. 9). Defendant checked and initialed each line indicating he understood his rights and was willing to waive those rights. (Id.). SA Thayer

did not display his gun or threaten Defendant. (Id. at p. 76). SA Thayer testified that Defendant seemed willing to talk. (Id.).

After Defendant waived his Miranda rights, SA Thayer asked him about the location of the gun. (Id. at p. 77–78). In addition to describing the gun's location, Defendant also informed SA Thayer how he acquired the gun. (Id. at p. 79). The interview then ended. (Id.).

On July 3, 2018, law enforcement ran a firearms-sniffing dog through the search area, but were still unable to locate the gun. (Id. at p. 25). Law enforcement's primary concern was finding the gun before any children found it. (Id. at p. 25–26). On July 5, 2018, SA Seymore approached Defendant again at the jail to ask him about the gun. (Id. at p. 26). Before the agents had the chance to advise Defendant of his rights, Defendant invoked his right to an attorney and the agents terminated the interview and asked him no questions. (Id.). Defendant was charged federally by a criminal complaint on July 5, 2018, and appeared in front of the federal magistrate judge on July 6, 2018. (Id. at p. 26–27).

On July 5, July 10, and July 25, 2018, SA Corwin and SA Seymore applied for five separate search warrants pertaining to the shooting investigation as well as a separate investigation involving a bank robbery in Albuquerque, New Mexico, on May 21, 2018. (Ex. 3–7).

Two of the search warrants, which were sworn out on July 5 and July 10, 2018, requested information associated with Defendant's email address and Facebook account in order to obtain more information about the alleged

6

murder weapon. (Ex. 3, 4; Doc. 67 at p. 27–28). These two search warrants were accompanied by affidavits containing detailed information about the shooting, and included Defendant's statement that he purchased the firearm on Armslist.com using his email address, which he provided to SA Thayer. (Ex. 3). The Facebook search warrant also contained information received from Armslist.com pertaining to Defendant's purchases of guns and ammunition, as well as statements from Defendant's cousin regarding Defendant's Facebook account. Defendant's cousin told law enforcement that Defendant messaged him using Facebook Messenger regarding the gun. (Ex. 4). Based on the information contained in the affidavits, the undersigned magistrate judge[1] found probable cause to issue the search warrants. (Ex. 3, 4).

Also on July 10, 2018, SA Seymore swore out a search warrant for property located at the Pennington County Jail belonging to Defendant. (Ex. 5). The affidavit described the Albuquerque bank robbery, established Defendant's connection to the robbery, and requested to search Defendant's clothing worn on the morning of the arrest and compare it to clothing seen on the bank surveillance video. (Id.). The magistrate judge found probable cause and issued the search warrants. (Id.). On July 25, 2018, SA Seymore applied for two additional search warrants related to the Albuquerque bank robbery. (Ex. 6, 7). The search warrants again described the robbery, established

---

[1]   Magistrate judges may properly issue report and recommendations regarding search warrants they previously authorized. See United States v. Campbell, No. 12-CR-40039-KES, 2012 WL 6042757 (D.S.D. Dec. 5, 2012) (adopting R&R of magistrate judge who also issued search warrant challenged in suppression motion).

Defendant's connection with the robbery, and requested to search Defendant's mother's home in Rapid City, and Defendant's uncle's home in Kyle for evidence of the robbery. (Id.). The magistrate judge found probable cause and issued the search warrants. (Id.).

## DISCUSSION

Defendant raises several arguments in favor of suppression. First, Defendant argues he did not voluntarily waive his Miranda rights when he was interviewed on the morning of June 28, 2018, and therefore his statements should be suppressed. (Doc. 54 at p. 1–2; Doc. 69 at p. 1–2). Defendant agreed at the evidentiary hearing that Miranda warnings were provided, and withdrew his previous position that Defendant was not read his Miranda rights. (Doc. 67 at p. 65–66). Defendant additionally argues that his statements should be suppressed because he was not promptly brought in front of a federal magistrate judge, and instead was held in tribal jail for charges over which the tribe had no jurisdiction. (Doc. 54 at p. 1–2). Finally, Defendant argues that none of the search warrants were based on probable cause, and all evidence obtained under them must be suppressed. (Id. at p. 2–3; Doc. 69 at p. 2–3). The government resists the motion to suppress in all aspects. (Docs. 59; 66; 68).

**I.  Defendant's Miranda waiver was not involuntary**

Defendant argues that he involuntarily waived his Miranda rights because he was suffering from sleep deprivation, was exhausted after walking eight miles from Kyle to the sundance grounds, and had not been given food or

8

water. (Doc. 69 at p. 1–2). Defendant does not argue that his post-waiver statements were involuntary. The government responds that Defendant fully understood his rights before waiving them, and law enforcement did not coerce him into waiving his rights. (Doc. 59 at p. 5–6).

"Prior to any questioning, [a suspect] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda v. Arizona, 384 U.S. 436, 444 (1966). Once warned, a suspect "may waive effectuation of [Miranda] rights, provided the waiver is made voluntarily, knowingly and intelligently." Id. at 444. The inquiry into the validity of a Miranda waiver has "two distinct dimensions." United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Id. "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Id. (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). Although Defendant only addresses the voluntariness prong, the court will additionally address whether his waiver was knowingly made. For the following reasons, Defendant voluntarily, knowingly, and intelligently waived his Miranda rights.

9

### A. Whether Defendant's Waiver was Voluntary

"Due process requires that confessions be voluntary." United States v. Anaya, 715 F. Supp. 2d 916, 931 (D.S.D. 2010) (citing Brown v. Mississippi, 297 U.S. 278, 285–86 (1936)). "The determination of whether a waiver is voluntary for Miranda purposes is determined by the same standard used to determine whether a statement is voluntary for Fifth Amendment due process purposes." Id. at 934 (citing United States v. Makes Room for Them, 49 F.3d 410, 414 (8th Cir. 1995)).

"The appropriate test for determining the voluntariness of a confession is 'whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will.'" United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990) (quoting United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989)). A statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). "On the other hand, a statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004). The government bears the burden of showing by a preponderance of the evidence that the challenged statements were voluntary. Id.

When assessing whether the defendant's will was overborne, the court considers "the conduct of the officers and the characteristics of the accused."

10

Id. Relevant factors include the defendant's prior experience with law enforcement; the nature of the interrogation, including its duration and location; whether the defendant was in custody or otherwise restrained; whether law enforcement employed hostile tactics; and defendant's intelligence and mental state, which would render him peculiarly susceptible to having his will overborne. See, e.g., id. at 726. "Sleeplessness, alcohol use, and drug use are relevant to [the] analysis, but intoxication and fatigue do not automatically render a confession involuntary. . . . Instead, the test is whether these mental impairments caused the defendant's will to be overborne." United States v. Gaddy, 532 F.3d 783, 788 (8th Cir. 2008) (internal quotations omitted); see Makes Room For Them, 49 F.3d at 415 (declining to adopt a *per se* rule of involuntariness when confronted with intoxication and/or fatigue); United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990) (confession was voluntary even though defendant had recently used methamphetamine and had not slept for five days); United States v. Petary, 857 F.2d 458, 461 (8th Cir. 1988) (statements were voluntary even though defendant had not slept for 24 hours, had consumed beer but no food, and was interrogated by four agents for six to seven hours). "Whether a defendant received Miranda warnings only moments before he made his incriminating statements is a consideration the Supreme Court has treated as important, although not dispositive, in determining voluntariness." United States v. Vega, 676 F.3d 708, 718 (8th Cir. 2012) (internal alterations, citations and quotation marks omitted).

"A statement cannot be rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity." Anaya, 715 F. Supp. 2d at 931–32 (citing Colorado v. Connelly, 479 U.S. 157, 164, 167 (1986)).  "It is improper for a police officer to obtain a confession through an express or implied promise of leniency."  Smith v. Bowersox, 311 F.3d 915, 922 (8th Cir. 2002).  However, officers may "elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices."  United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (internal quotation marks and citations omitted).  "None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation caused the defendant's will to be overborne."  Id.  (internal quotation omitted) (finding defendant's confession voluntary even though agents promised defendant he would not be arrested).

Defendant argues he did not voluntarily waive his Miranda rights. Although Defendant does not specifically address his susceptibility, he presumably claims he was particularly susceptible to police coercion because he was suffering from sleep deprivation and was hungry, thirsty, and exhausted from his eight-mile journey.  However, even though Defendant claims he was too exhausted to voluntarily waive his rights, he appeared alert and competent during the interview, did not struggle to stay awake, and did

not ask to terminate the interview.  The fact that Defendant was tired does not, on its own, establish involuntariness.  Makes Room For Them, 49 F.3d at 415.

Also relevant to the court's inquiry are Defendant's personal characteristics.  Defendant was nineteen years old at the time of the interview and has no criminal history other than the instant alleged offense.  (Doc. 28). However, the agents carefully and clearly explained Defendant's rights to him in full, and Defendant stated he understood each right.  The Defendant's responses were coherent and intelligible.  The interview lasted just over a half an hour and was conducted in a typical interview room with a window and a door.  Although the defendant was in custody, nothing about his surroundings would render his confession involuntary.  Furthermore, no evidence shows Defendant was under the influence of any substance or had any mental deficiency or impairment.  For these reasons, the court finds Defendant was not particularly susceptible to having his will overborne.  See LeBrun, 363 F.3d at 726.

Moreover, no evidence indicates law enforcement behaved in a coercive manner.  See Anaya, 715 F. Supp. 2d at 931–32.  To the contrary, the recorded interview shows the agents did not raise their voices, did not make any threats or promises, and carefully explained Defendant's rights before asking him any questions.  The agents did not display their guns or otherwise coerce Defendant into waiving his rights.  Defendant was not restrained during the interview, and the interview lasted approximately thirty minutes.  In short,

Defendant presents no evidence of coercion. For these reasons, Defendant voluntarily waived his Miranda rights.

**B.      Whether Defendant's Waiver Was Knowing and Intelligent**

To be knowing and intelligent, a Miranda waiver must be made with made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Berghuis, 560 U.S. at 382–83 (quoting Moran, 475 U.S. at 421). Police coercion has no bearing on the question of whether a waiver is knowing and intelligent. United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)). The Eighth Circuit has expressly declined to adopt a *per se* rule when confronted with intoxication or mental incapacity, focusing instead on the suspect's ability to comprehend his rights regardless of any impairment. Turner, 157 F.3d at 555 (finding waiver of Miranda rights knowing and intelligent where defendant "was clearly intelligent enough to understand his rights" even though he was intoxicated with PCP at time of confession and his IQ was in "low-average to borderline range"); see also Makes Room For Them, 49 F.3d at 414.

The record shows Defendant was intelligent enough to understand his rights. Defendant's claim that he was too tired to waive his rights is belied by his responsive, alert behavior and his statement that he both understood his rights and was willing to waive them. (Ex. 1; Ex. 2). As stated above, the agents fully and carefully explained each Miranda right to Defendant before he agreed to speak with them. Defendant fails to show that he did not have a full

awareness of the nature of the rights and the consequences of his decision to abandon them.  See Berghuis, 560 U.S. at 382–83.  For these reasons, Defendant knowingly and intelligently waived his rights.

## II.    Fed. R. Crim. P. 5's Appearance Requirement Was Not Violated

Defendant argues that federal authorities violated Federal Rule of Criminal Procedure 5(a)(1)(A)'s requirement that an arrestee be brought before a magistrate judge "without unnecessary delay" after being arrested, because Defendant did not appear before the federal magistrate judge until nine days after he was originally arrested.  (Doc. 54 at p. 2; Doc. 69 at p. 2).  Defendant additionally argues the Oglala Sioux Tribe does not have jurisdiction over homicides.  (Id.).  The government responds that Defendant was brought into federal custody on July 5, 2018, and was promptly brought before a magistrate judge on July 6, 2018.  (Doc. 59 at p. 7).

Rule 5(a)(1)(A) provides that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise."  Defendant argues he was in FBI custody as of June 28, 2018, when he was first arrested.  (Doc. 69 at p. 2).  Because he did not appear before the federal magistrate judge until July 6, 2018, Defendant argues federal authorities violated Rule 5(a).  (Id.).

Defendant was taken into tribal custody on June 28, 2018, when he was charged tribally with homicide and a weapons offense and held at the Medicine Root Detention Facility at Kyle, SD.  (Doc. 67 at p. 22, 43–44).  Defendant was

15

charged federally through a complaint on July 5, 2018. (Doc. 1). On that same day, Defendant was brought into federal custody by a writ of habeas corpus ad prosequendum. (Doc. 5). Defendant appeared in front of a federal magistrate judge on July 6, 2018. Because Defendant had his initial appearance in federal court one day after being brought into federal custody, no "unnecessary delay" occurred.  See Fed. R. Civ. P. 5(a).

Defendant's allegations that the Oglala Sioux Tribe violated its own constitution by holding Defendant in tribal custody have no bearing on this case. Defendant neither establishes a nexus between alleged tribal constitutional violations and suppression of evidence in this case, nor states what evidence should be suppressed as a result of those alleged violations. Defendant further does not establish a nexus between the alleged Rule 5 violation and the evidence to be suppressed. Because Defendant was not brought into federal custody until July 5, 2018, and appeared in front of a federal magistrate judge the following day, no violation of Rule 5(a) occurred. Defendant's Motion to Suppress should be denied on this point.

### III.   Validity of the Search Warrants

Defendant argues that none of the search warrants were based on probable cause, and all evidence obtained under them must be suppressed. (Id. at p. 2–3; Doc. 69 at p. 2–3). In support of his argument, Defendant states "[n]one of the affidavits in support of the search warrants contained any information about the source of the information and the reliability of the person or persons providing any information as required." (Doc. 69 at p. 2). At

16

the March 6, 2019 evidentiary hearing, Defendant neither challenged the information contained in the search warrants nor the reliability of the sources of information.  (See Doc. 67 at p. 52–55).  The government responds that all searches and seizures were executed pursuant to a search warrant or with consent, and states that Defendant did not reference anything in the search warrants challenging the reliability of the information contained therein.  (Doc. 68 at p. 4).

Probable cause for the issuance of a warrant exists if there is a "fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  The magistrate judge previously found probable cause to issue each search warrant.  Each affidavit contains a detailed probable cause section based Defendant's interview, statements from Defendant's cousin, and information obtained from Armlist.com and from the Albuquerque FBI investigation regarding the May 2018 bank robbery.  Defendant identifies no reason why the search warrants did not adequately establish probable cause, other than claiming generally that none of the search warrants contained information about the sources.  To the contrary, each search warrant set forth detailed information corroborated by various identified sources, which created a fair probability that evidence of a crime would be found in the specified locations to be searched.   See Gates, 462 U.S at 238.  Defendant's argument is without merit, and his request to suppress evidence obtained from the search warrant should be denied.

## CONCLUSION

For the aforementioned reasons, it is respectfully recommended that Defendant's Motion to Suppress be denied in full.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 4th day of June, 2019.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge