UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　vs.<br><br>PALANI BULL BEAR,<br><br>　　　　　　Defendant. | CR. 18-50076-JLV<br><br>ORDER |

**INTRODUCTION**

A grand jury indicted defendant Palani Bull Bear on charges of second degree murder, discharging a firearm during a crime of violence, assault with intent to commit murder, and assault with a dangerous weapon. (Docket 48). The charges stem from a shooting in Kyle, South Dakota, on June 27, 2018, that killed Brycee Red Owl. Id. Pending before the court is defendant's motion to suppress statements he made to law enforcement officers and evidence seized pursuant to five search warrants. (Docket 54). The government opposes the motion. (Docket 59).

The suppression motion was referred to Magistrate Judge Daneta Wollmann for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and the court's April 1, 2018, standing order. The magistrate judge conducted an evidentiary hearing on March 6, 2019, at which two witnesses testified and nine exhibits were received into evidence. (Dockets 63 & 65). The parties submitted post-hearing briefing. (Dockets 66, 68 & 69). The magistrate judge

then issued a report and recommendation ("R&R") concluding defendant's motion should be denied. (Docket 70). Defendant timely filed objections to the R&R. (Docket 71).

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files written objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id. The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. For the reasons given below, the court overrules defendant's objections to the R&R and adopts the R&R as modified by this order.

## DISCUSSION

### I.  Defendant's Objections

Defendant does not appear to object specifically to any of the magistrate judge's factual findings.[1]  He does make three discernable legal objections to the R&R.  Specifically, he argues:

---

[1]Defendant does state that law enforcement had not advised him of his Miranda rights before he made "any statements" to Bureau of Indian Affairs ("BIA") Special Agent Molanna Clifford ("SA Clifford"). (Docket 71 at ¶ 8). Defendant was Mirandized before SA Clifford and other law enforcement interviewed him on the morning of June 28. Docket 70 at p. 3; see also infra Section II. If defendant is referring to statements he made to SA Clifford or other BIA agents while he accompanied them to search for the gun used in the homicide, it appears those statements would have been made on the morning or early afternoon of June 28 as well. (Dockets 67 at pp. 50-52, 72-73 & 70 at p. 5). The court concludes defendant was given Miranda warnings before speaking to SA Clifford. See also Berguis v. Thompkins, 560 U.S. 370, 386 (2010) ("Police are not required to rewarn suspects from time to time.").

1. His waiver of his Miranda rights was not voluntary, knowing or intelligent. (Docket 71 at ¶¶ 12-16).

2. He was not brought before a United States magistrate judge "without unnecessary delay" as required by Federal Rule of Criminal Procedure 5. Id. at ¶¶ 17-20.

3. The five search warrants lacked information "establishing the reliability" of informants. Id. at ¶¶ 21-23.

The court will address each objection in turn.

## II. Facts

The court adopts the R&R's factual findings in full. (Docket 70 at pp. 2-8). Defendant does not challenge the magistrate judge's finding that the law enforcement witnesses—Federal Bureau of Investigation ("FBI") Special Agent Kevin Seymore ("SA Seymore") and BIA Special Agent Ted Thayer ("SA Thayer")—who testified at the evidentiary hearing were credible. The court likewise finds them credible.

At approximately 11 p.m. on June 27, 2018, defendant allegedly shot and killed Brycee Red Owl in Kyle, South Dakota. (Docket 67 at pp. 5-9, 36). Defendant also allegedly shot at Tolin Gregg, who was with Mr. Red Owl, missing him but striking the horse he was riding. Id. at pp. 7-9. Kyle and the nearby locations at issue in this case are within the exterior boundaries of the Pine Ridge Reservation.

SA Seymore arrived at the site of the homicide at approximately 3 a.m. on June 28. Id. at p. 5. After arriving, he spoke with Mr. Gregg. Id. at pp. 7-10. Mr. Gregg told SA Seymore he had been on horseback with Mr. Red Owl when

3

defendant shot at them, killing Mr. Red Owl.² Id. at pp. 8-9. Mr. Gregg observed defendant leave the area on foot, heading west toward the Lil' Angel's convenience store.³ Id. at p. 10. However, Oglala Sioux Tribe Department of Public Safety ("OST DPS") officers who were familiar with defendant's mother, Lucy Bull Bear, knew the family was at the sundance grounds located approximately eight miles to the east of Kyle. Id. Law enforcement believed defendant might try to meet up with his family at the sundance grounds. Id.

Law enforcement contacted the firekeeper at the sundance grounds, who agreed to inform them if defendant arrived at the grounds. Id. At approximately 6 a.m. on June 28, defendant arrived at the sundance grounds, where OST DPS officers arrested him. Id. at p. 11. The Oglala Sioux Tribe charged defendant with homicide and a weapons offense. Id. at p. 22. During the approximately seven hours between the homicide and his arrest at the sundance grounds, SA Seymore estimated defendant traveled 10-11 miles on foot. Id. at p. 41. Defendant first traveled west from Kyle, looped around the south side of town, and then proceeded east to the sundance grounds. Id. SA

---

²In his objections to the R&R, defendant argues he was acting in self-defense. (Docket 71 at ¶ 7). That argument has no bearing on the suppression motion and the court expresses no view as to its use at trial.

³Defendant asserts Mr. Gregg was "drunk at the time"—presumably at the time of the shooting and SA Seymore's later questioning—and "could not [provide] any credible evidence," including as to where defendant fled after the homicide. (Docket 71 at ¶¶ 1-2). SA Seymore testified Mr. Gregg had been drinking that day. (Docket 67 at pp. 47, 65). However, Mr. Gregg's credibility is not relevant to this suppression motion. The court declines to judge the reliability of Mr. Gregg's June 28 statements to law enforcement.

4

Seymore did not know whether defendant had access to food or water during the trek.  Id. at p. 38.  Defendant later stated he slept at some point before arriving at the sundance grounds.  Id.

At 7:30 a.m. on June 28, SA Seymore and SA Clifford interviewed defendant at the Medicine Root Detention Center in Kyle.  Id. at pp. 11-12. Approximately two minutes into the interview, SA Clifford read defendant his Miranda rights.[4]   Hearing Ex. 1 at 1:54 – 4:00.  SA Clifford individually read each right to defendant and asked if he understood.  Id.  Defendant agreed that he understood each right.  Id.  Defendant also agreed to waive his Miranda rights.  Id.  Defendant signed a BIA Miranda warning form indicating he understood and waived his rights.  Hearing Ex. 2.

The interview lasted approximately 30 minutes.  Id.; Docket 67 at p. 20. SA Seymore did not have a gun visible during the interview.[5]  Id.  The interview room was approximately 10 feet by 15 feet, with one door.  Id. at 13, 15. Defendant was not restrained during the interview.  Id. at p. 16.  The court agrees with the magistrate judge's assessment that the agents "made no threats or promises, spoke slowly, and did not raise their voices."  (Docket 70 at p. 5). SA Seymore testified defendant "seemed a little slow or a little sore" but was "calm," "matter of fact," and "did not seem scared or unable to articulate what he wanted to say."  (Docket 67 at p. 17).  Defendant did not mention exhaustion or

---

[4]Miranda v. Arizona, 384 U.S. 436 (1966)

[5]The record does not disclose whether SA Clifford had a gun visible during the interview.

ask to stop the interview.  Id. at p. 18.  The interview was audio recorded and the magistrate judge received a copy of the recording into evidence as Exhibit 1. Id. at pp. 18-19.  The court listened to the interview and agrees with SA Seymore's description of defendant's demeanor.  During the interview, defendant confessed to shooting Mr. Red Owl and Mr. Gregg.  Hearing Ex. 1 at 4:03 – 5:34.

After the interview, law enforcement unsuccessfully searched for defendant's gun, which he stated he dropped in a field outside Kyle.  Id.  SA Clifford took defendant to the field on June 28 to search for the gun.  (Docket 67 at pp. 72-73).  At least one of the officers during the search with defendant wore an activated body camera, generating footage of the search.  Id. at p. 73.  That video is not in the record.

On June 29, SA Thayer interviewed defendant about the gun.  Id. at pp. 74-80.  SA Thayer read defendant his Miranda rights and defendant signed a BIA form indicating he agreed to waive his rights.  Id. at pp. 75, 77; Hearing Ex. 9.  SA Thayer testified he did not threaten defendant and did not have a weapon during the interview.  (Docket 67 at p. 76).  Defendant "seemed willing to talk" in SA Thayer's view.  Id.  SA Thayer attempted to record the interview, but the recording device malfunctioned.  Id.  On July 5, SA Seymore attempted to interview defendant again, but he invoked his right to an attorney and SA Seymore did not proceed.  Id. at p. 26.

On July 5, the government charged defendant with second degree murder by criminal complaint.  (Docket 1).  The magistrate judge issued a writ of habeas corpus ad prosequendum to bring defendant from the Adult Offenders Facility in Pine Ridge, South Dakota, to Rapid City, South Dakota, for his initial appearance.  (Docket 5).  Defendant made his initial appearance before the magistrate judge on July 6.  (Docket 8).

The magistrate judge issued five search warrants in this case.  See Docket 70 at pp. 6-8 (describing the warrants); see also Dockets 59-3 – 59-7.  Each warrant was issued after defendant's arrest and confession.  Three of the warrants relate to a bank robbery in Albuquerque, New Mexico.  (Docket 70 at pp. 7-8).  An anonymous tipster informed the Albuquerque FBI that defendant robbed a bank in that city.  (Docket at 59-5 at p. 7).  SA Seymore positively identified defendant from a wanted poster showing three still shots from the robbery.  Id.

### III. Analysis

#### A. **Miranda waiver legal standards**

A defendant can waive his Miranda rights if "the waiver is made voluntarily, knowingly and intelligently."  Miranda, 384 U.S. at 444.

> The waiver inquiry "has two distinct dimensions": waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

Berghuis v. Thompkins, 560 U.S. 370, 382-83 (2010) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "[T]he Government must show that the waiver was knowing, intelligent, and voluntary." United States v. Woods, 829 F.3d 675, 680 (8th Cir. 2016).

### 1. Voluntariness

Courts determine whether a Miranda waiver is voluntary under the same standards used to judge if a statement to law enforcement is voluntary. United States v. Makes Room for Them, 49 F.3d 410, 414 (8th Cir. 1995). A defendant's statement to law enforcement is "involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." Simmers v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001).

> Whether a confession is involuntary is judged by the totality of the circumstances. . . . The court must look at the "conduct of the officers and the characteristics of the accused." . . . The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary.

United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (quoting Wilson v. Lawrence Cty., 260 F.3d 946, 952 (8th Cir. 2001)). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986).

> [O]fficers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and

8

even using raised voices. None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation caused the defendant's will to be overborne.

United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (internal quotations and citations omitted).

Some "of the key concerns in judging whether confessions [are] involuntary . . . [are] the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne." Wilson, 260 F.3d at 952. The United States Court of Appeals for the Eighth Circuit has "[g]enerally . . . concluded that where the defendant possessed at least average intelligence, then his inculpatory statements were not compelled." LeBrun, 363 F.3d at 726.

### 2. Knowingness and intelligence

"If the [government] establishes that a Miranda warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of Miranda rights. . . . The prosecution must make the additional showing that the accused understood these rights." Berghuis, 560 U.S. at 384. "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Id. "Lack of awareness of the potential adverse impact of statements is not sufficient in itself to invalidate waiver of" Miranda rights. United States v. Peck, 161 F.3d 1171, 1174 (8th Cir. 1998). Law enforcement need not give "a specific

9

warning on the potential sentencing consequences of waiving [Miranda] right[s.]" United States v. Johnson, 47 F.3d 272, 277 (8th Cir. 1995).

## B. Miranda waiver analysis

Defendant's first objection to the R&R argues his Miranda waiver was not voluntary, knowing or intelligent. (Docket 71 at ¶¶ 12-16). He specifically asserts he was sleep deprived and exhausted after traveling to the sundance grounds on foot for seven hours with no food or water. Id. at ¶ 12. Defendant also argues the government introduced "no evidence concerning [his] intelligence or other cognitive ability to understand a waiver" of his Miranda rights. Id. at ¶ 15. The magistrate judge rejected defendant's arguments on this topic and the court does as well.

The magistrate judge cogently and at length explained why defendant's waiver was voluntary. (Docket 70 at pp. 8-14). Defendant does not directly object to any of the magistrate judge's reasoning and the court adopts it in full. The only factor the court need consider to resolve defendant's objection is the complete lack of coercion in any encounter of law enforcement with defendant. The court cannot find defendant confessed involuntarily in the absence of police coercion. Connelly, 479 U.S. at 167. Defendant does not allege any "coercive

police activity" occurred and the court consequently cannot conclude his confession was involuntary.[6]  Id.

The magistrate judge also concluded defendant's waiver of his Miranda rights was knowing and intelligent.  (Docket 70 at pp. 14-15).  Defendant's objection to this conclusion only argues "[t]here was no evidence concerning defendant's intelligence or other cognitive ability to understand a waiver[.]" (Docket 71 at ¶ 15).  While the factual record regarding defendant's intelligence is sparse it is not, as he suggests, nonexistent.  SA Seymore testified defendant dropped out of high school during his sophomore year, indicating he has some educational background.  (Docket 67 at pp. 57-58).  He also testified defendant was "alert . . . aware of what was going on around him" and "didn't seem . . . unable to process what was happening."  Id. at p. 17.  On the recorded June 28 interview, defendant understood and cogently answered questions by law enforcement.  Hearing Ex. 1.  He also affirmatively stated he understood each Miranda right as SA Clifford read them to him.  Id. at 1:54 – 4:00.  The standard BIA form SA Clifford read the Miranda rights from is not complex. Hearing Ex. 2.  "There is no basis in this case to conclude that [defendant] did not understand his rights . . . from this it follows that he knew what he gave up when he spoke."  Berghuis, 560 U.S. at 385.

---

[6]Defendant argues the Oglala Sioux Tribe charged him with homicide despite having no jurisdiction over that offense to scare him into speaking with law enforcement.  (Docket 71 at ¶ 14).  As stated below, the Oglala Sioux Tribe has jurisdiction over homicides committed by one tribal member against another.  See infra Section III.C.  A valid criminal charge is not "coercive police activity."  Connelly, 479 U.S. at 167.

11

Defendant's objection appears tailored to the June 28 morning interview.[7] (Docket 71 at ¶ 12) (discussing sleep deprivation and foot travel). The court finds defendant's waiver of his Miranda rights as to that interview was voluntary, knowing and intelligent. Defendant's first objection is overruled.

### C. Federal Rule of Criminal Procedure 5(a)

Defendant's second objection argues the government violated Federal Rule of Criminal Procedure 5(a) by failing to bring him before a United States magistrate judge without unnecessary delay. (Docket 71 at ¶¶ 17-20). He asserts the Oglala Sioux Tribe has no jurisdiction over homicide charges and that he was taken into tribal custody as a scare tactic. Id. at ¶¶ 17-18. Defendant also contends tribal and federal officers "were acting together" in keeping him in tribal custody. Id. at ¶ 17. He asserts the Rule 5(a) violation requires the court to suppress his confession. Id. at ¶ 20. The magistrate judge concluded Rule 5(a) was not violated because defendant made his initial appearance in federal court on July 6, one day after he was federally charged. (Docket 70 at pp. 15-16). The court rejects the R&R's reasoning on this topic but finds it cannot suppress defendant's confession.

"A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge[.]" Fed. R.

---

[7]If defendant intended to argue the Miranda waiver he executed on June 29 was involuntary or otherwise deficient, the court rejects that argument. The government carried its burden of validating that waiver. See Docket 67 at 74-77 (SA Thayer describing noncoercive atmosphere of June 29 interview); Hearing Ex. 9 (defendant's signed Miranda waiver for June 29 interview).

12

Crim. P. 5(a)(1)(A). "Rule 5(a) applies only to persons arrested and held under federal law." United States v. Cooke, 853 F.3d 464, 470 (8th Cir. 2017) (quoting United States v. Elliott, 435 F.2d 1013, 1015 (8th Cir. 1970)).

> Although Rule 5 does not apply where the defendant has been arrested by local authorities and is in their sole custody, it may apply in the absence of a federal arrest when there is evidence indicating that the arrest and detention by the state official were at the request of federal authorities or for the purpose of assisting them.

Id. (quotations omitted).

> The requirements of Rule 5(a) . . . are designed to frustrate law-enforcing officers from detaining the arrested person for an unnecessary period of time to enable the officer to extract a confession from the arrested individual. But this salutary principle is not applicable where the person under arrest is in the custody and under the control of local and not federal officers, unless, of course, the state officers are acting at the direction of or in concert with the federal officers, or there is collaboration between the federal and state authorities.

United States v. Jeanetta, 533 F.3d 651, 655-56 (8th Cir. 2008) (quoting United States v. Morris, 445 F.2d 1233, 1236 (8th Cir. 1971)). The Eighth Circuit "has held that a Rule 5(a) violation will not affect a conviction absent a showing of prejudice." United States v. Chavez, 705 F.3d 381, 385 (8th Cir. 2013). The "appropriate remedy" for a Rule 5(a) violation is "suppression of the statements made during that period[.]" Id. at 386.

OST DPS officers arrested defendant on tribal charges on June 28. (Docket 67 at pp. 11, 22). He was federally charged on July 5 and made his initial appearance on July 6. (Dockets 1 & 8). If defendant's time spent in tribal custody is attributable to federal authorities for the purposes of Rule 5(a),

13

he was held for eight days before his initial appearance.  The government did not justify the delay, but instead argues there was no Rule 5(a) violation at all because defendant was in tribal custody during the delay.  (Docket 59 at p. 7).

The court must first determine whether defendant's eight-day span of tribal custody before his federal initial appearance can be attributed to federal authorities for Rule 5(a) purposes.  The parties did not argue this question and the magistrate judge did not consider it in her R&R.  The court concludes tribal officials were acting "in concert with the federal officers," rendering their delay attributable to the government.  Jeanetta, 533 F.3d at 656.  Federal agents were on the scene of the homicide almost immediately after it took place.  See Docket 67 at pp. 5-6 (SA Seymore describing arriving on scene at 3 a.m. and meeting BIA agents, along with OST DPS officers).  Tribal officers arrested defendant, who was then interviewed by federal agents.  Id. at pp. 10-22.  Federal and tribal officers jointly searched for the homicide weapon.  Id. at pp. 23-26.  It is true defendant was held in tribal custody, pursuant to tribal charges, but it is equally clear that federal law enforcement was the primary driver of the homicide investigation which resulted in defendant's arrest.

This conclusion is bolstered by the restrictive sentencing laws applicable to Indian country homicides.  The Oglala Sioux Tribe cannot sentence defendant to more than three years of imprisonment.[8]  25 U.S.C. § 1302(b).  This sentencing limitation undoubtedly spurred tribal law enforcement to

---

[8]A tribal court can only sentence a defendant to more than one year of imprisonment if it provides certain procedural safeguards.  25 U.S.C. § 1302(c).

coordinate their efforts with the federal government, which has the ability to bring a homicide case resulting in more than three years imprisonment. Under these circumstances, the court is confident defendant's "arrest and detention by the [tribal] official[s] were at the request of federal authorities or for the purpose of assisting them." Cooke, 853 F.3d at 470. The court concludes the delay between defendant's arrest and his initial appearance is attributable to the government for purposes of Rule 5(a).[9] The court accordingly rejects the magistrate judge's conclusion there was no Rule 5(a) violation because defendant was in tribal custody during the pre-initial appearance delay.

However, the court's holding the pre-initial appearance delay in this case can give rise to a Rule 5(a) violation does not by itself merit suppression of defendant's confession. A confession given within six hours of arrest cannot be

---

[9]Defendant's argument that the Oglala Sioux Tribe has no jurisdiction over homicide offenses is both incorrect and immaterial to the question of whether his tribal custody can be attributed to the government in the Rule 5(a) context. (Docket 71 at ¶ 9, 18). "[W]hen an Indian tribe criminally punishes a tribe member for violating tribal law, the tribe acts as an independent sovereign, and not as an arm of the Federal government." United States v. Wheeler, 435 U.S. 313, 329 (1978) (citing Talton v. Mayes, 163 U.S. 376 (1896)). The Major Crimes Act's grant of federal jurisdiction over Indian country homicides creates concurrent jurisdiction with tribal governments, not exclusive federal jurisdiction. See 18 U.S.C. § 1153; see also United States v. Young, 936 F.2d 1050, 1055 (9th Cir. 1991), overruled on other grounds by United States v. Vela, 624 F.3d 1148, 1157-59 (9th Cir. 2010) ("[F]ederal courts have *concurrent* jurisdiction over the offenses listed in the Major Crimes Act" with tribal courts) (emphasis added). Defendant also does not contest his Indian status. (If defendant is non-Indian, the Oglala Sioux Tribe would not have jurisdiction. Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 195 (1978).) The court finds the Oglala Sioux Tribe had jurisdiction to hold defendant in custody for the alleged homicide and doing so did not constitute a scare tactic or other coercive method that would merit suppression.

15

suppressed due to a Rule 5(a) violation. 18 U.S.C. § 3501(c); see also Corley v. United States, 556 U.S. 303, 322 (2009). Assuming without deciding that the eight-day delay between defendant's arrest and initial appearance was both unnecessary and prejudicial to defendant, the court nevertheless cannot suppress defendant's confession because he made it within six hours of his arrest. OST DPS officers arrested defendant at approximately 6 a.m. on June 28. (Docket 67 at p. 11). The interview in which he confessed began at approximately 7:30 a.m. and took about 30 minutes. Id. at p. 12; Hearing Ex. 1. Defendant made his confession well within six hours of his arrest. The court cannot suppress defendant's confession. Defendant's second objection is overruled and the R&R is modified consistent with this section.

### D. Search warrants

Defendant's final objection argues the five search warrants issued by the magistrate judge lacked "information . . . establishing the reliability of any of the people providing the information or truthfulness of the alleged facts." (Docket 71 at ¶ 21). Defendant also contends the magistrate judge "cannot consistent with due process and other applicable law issue search warrants and then in a separate proceeding pass on their validity."[10] Id. at ¶ 11. He asserts all evidence seized under the warrants should be suppressed. Id. at ¶ 22. The magistrate judge concluded each search warrant "set forth detailed information corroborated by various identified sources," sufficient to establish probable

---

[10]The quoted sentence is the entirety of defendant's argument. He does not cite any authority in support of this proposition.

cause. (Docket 70 at p. 17). The court adopts the R&R on this point and overrules defendant's objection.

When issuing a search warrant,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

Illinois v. Gates, 462 U.S. 213, 238-39 (1983) (quotations omitted). "If an informant's tip is the source of information, the affidavit must recite some of the underlying circumstances from which the informant concluded that relevant evidence might be discovered, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, was credible or his information reliable." Franks v. Delaware, 438 U.S. 154, 165 (1978).

As the magistrate judge noted, defendant's reliability argument is extremely general, failing to identify any particular informant or fact lacking indicia of credibility. Defendant's deficient objection aside, the court concludes each warrant established probable cause. The first two warrants sought to search defendant's Gmail and Facebook accounts for information about the gun used in the homicide. See Dockets 59-3 & 59-4. Probable cause for these warrants is established by the affidavits recounting of defendant's confession, including his statements he purchased the gun online over e-mail. (Dockets

17

59-3 at ¶¶ 15-22 & 59-4 at ¶¶ 11-28). "Statements against the penal interest of an informant typically carry considerable weight in establishing reliability." United States v. Buchanan, 574 F.3d 554, 561-62 (8th Cir. 2009) (quotation omitted). The first two warrants relied only on information provided by defendant himself, which was sufficiently reliable to establish probable cause to believe useful information would be found in his Gmail and Facebook accounts.

The last three warrants concern items allegedly worn and carried by defendant in an Albuquerque robbery. See Dockets 59-5 – 59-7. In these warrants, SA Seymore recounts viewing photographs of the robbery and identifying defendant as the robber. (Dockets 59-5 at ¶¶ 14-15, 59-6 at ¶¶ 14-15 & 59-7 at ¶¶ 14-15). SA Seymore further "learned"—from whom, the affidavits do not specify—that the robber: used a gun matching defendant's description of the homicide weapon; was wearing black and white athletic shoes and a black belt with a square buckle and; was carrying a black or dark blue duffle bag. (Dockets 59-5 at ¶¶ 16-17, 59-6 at ¶¶ 16-17 & 59-7 at ¶¶ 16-17). These items are all similar to items SA Seymore knew were in the possession of the Pennington County Jail, where defendant is currently incarcerated, or at defendant's relatives' homes. (Dockets 59-5 at ¶¶ 18-19, 59-6 at ¶¶ 18-20 & 59-7 at ¶¶ 18-21).

While the affidavits do not state how SA Seymore learned defendant was allegedly wearing and carrying those items during the Albuquerque robbery, the context of the affidavits make clear SA Seymore either observed those items on

photographs of the robbery or learned about them from Albuquerque law enforcement.  Given SA Seymore's familiarity with defendant's items from the homicide investigation, the court concludes he could reliably compare his own knowledge of those items to the information received from the Albuquerque investigation.  The court concludes the affidavits are sufficiently reliable to establish probable cause that the items would be found in the places searched and that the items could be useful in investigating the Albuquerque robbery.

The court's de novo review of the material available to the magistrate judge when she issued these five warrants confirms each application stated sufficient reliable facts to find probable cause.  Defendant's argument the magistrate judge cannot review search warrants she issued fails because this court, on de novo review, agrees with the magistrate judge's conclusion.  Defendant received independent review of the search warrants, obviating any potential favoritism or bias the magistrate judge conceivably could have brought to bear in her review of the warrants.[11]

The court overrules defendant's third objection and adopts the R&R in full on this point.

---

[11]Defendant cited no authority in support of his contention a magistrate judge cannot properly review a warrant she issued.  The court is not aware of any authority supporting that proposition.  In fact, the practice in this district is for a magistrate judge to review her own warrants if necessary.  The court has no doubt the magistrate judge here reviewed the warrants with the necessary impartiality.

**ORDER**

For the reasons given above, it is

ORDERED that defendant's objections to the report and recommendation (Docket 71) are overruled.

IT IS FURTHER ORDERED that the report and recommendation (Docket 70) is adopted as modified by this order.

IT IS FURTHER ORDERED that defendant's suppression motion (Docket 54) is denied.

IT IS FURTHER ORDERED that a scheduling order shall issue.

Dated September 9, 2019.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE